Ilene Ruth MOSES, Appellant,

v.

David W. ALLARD, Appellee.

In re Ilene Ruth MOSES, Debtor.

Civ. A. No. 90–73567.
Bankruptcy No. 89–05640–G.

United States District Court,
E.D. Michigan, S.D.

Aug. 9, 1991.

Peter Jackson, Hill Lewis, Detroit, Mich., for debtor-appellant.

Thomas R. Morris, Shefferly & Silverman, Southfield, Mich., for trustee-appellee.

Roy Christiansen, Detroit, Mich., for creditor—SEMIFORA.

## INTRODUCTION

ROSEN, District Judge.

This action is before the Court on Trustee David W. Allard's ("Trustee") Motion For Order Compelling Debtor to Testify, filed April 12, 1991. The Trustee, representing the creditors in a Chapter 11 bankruptcy proceeding, moves the Court to compel the Debtor, Ilene Ruth Moses ("Debtor"), to respond under oath to certain questions concerning foreign assets associated with her failed business. In response to these questions, the Debtor invoked her Fifth Amendment privilege against self-incrimination, asserting that such compelled testimony could incriminate her in a pending criminal proceeding in Switzerland. She filed a response to the Trustee's motion on May 3, 1991 explaining the grounds for her assertion of the Fifth Amendment privilege to the questions at issue. On May 13, 1991, the Trustee filed a reply brief to Debtor's response. Oral argument was heard by the Court on August 2, 1991.

This Motion presents important questions of constitutional interpretation and jurisprudence on which there is little legal precedent and relatively sparse scholarly comment. Further, as criminal activity takes on an increasingly international character and modern technology brings nations and their police forces into increasingly close contact, the issues presented in this case will be of increasing immediacy and import. For these reasons, the Court will attempt to give the issues presented here the thorough and comprehensive treatment they merit.

## FACTS

The Debtor owns or controls a number of domestic and foreign companies doing business in the ladies' clothing industry.

On August 1, 1989, four of her creditors, Semifora AG ("Semifora"), Peat Marwick Main & Co. ("Peat Marwick"), James Hope, and Henry and Helen Hunter, filed an Involuntary Petition under Chapter 7 of the Bankruptcy Code against the Debtor.

In mid-September 1989, the Debtor consented to the administration of her assets under Chapter 11 and remained in control of her property as debtor-in-possession. At this time, she filed schedules of assets and liabilities listing, among other things, ownership in Jolland Limited ("Jolland"), a foreign corporation based in Hong Kong. She valued her interest in Jolland at $89,000,-000.00.

The first Chapter 11 meeting of creditors was held on October 25, 1989. Citing her fear of prosecution in a criminal investigation then pending in Switzerland, the Debtor asserted her Fifth Amendment privilege against self-incrimination and refused to answer virtually all the creditors' substantive questions.

On the motion of creditors Semifora, Michigan National Bank, Peat Marwick, and Krusch & Modell, the Bankruptcy Court ordered the appointment of an independent Chapter 11 trustee on December 19, 1989.

In early 1990, the Debtor proposed to her creditors that, if given until September 5, 1990, she would tender funds adequate to

pay their claims. The creditors agreed, but the Debtor was unable to fund her plan by September 5, 1990 and, on September 10, 1990, the Bankruptcy Court converted the case to Chapter 7. As a result of this conversion, a Chapter 7 meeting of creditors was scheduled. Mr. Allard continued as Chapter 7 Trustee.

On October 4, 1990, prior to the first Chapter 7 meeting, the Trustee filed a Motion for Order Determining the Scope of Debtor's Right Not to Testify. This motion cited the Debtor's near complete refusal to answer questions at the October 25, 1989 Chapter 11 meeting of creditors. The motion sought to limit, in advance of the Chapter 7 meeting, Debtor's assertion of the Fifth Amendment.

The Bankruptcy Court had not ruled on the Trustee's motion as of the date of the Chapter 7 meeting. At that meeting, the Debtor answered questions concerning domestic assets but asserted the Fifth Amendment privilege with respect to her foreign assets and transactions. This included testimony as to alleged trusts located in Bermuda and Guernsey, in which she may have had an interest, her bank accounts located in the United Kingdom, Switzerland, Jersey, Hong Kong, and Bermuda, safe deposit boxes located in Switzerland, as well as questions relating to the source of funds she used for international travel. She also refused to disclose any information about her proposed plan of reorganization and payment of $30,000,000.00 or more to creditors, her sources of income other than domestic income, whether her other companies transacted any business overseas, and other matters. Moreover, she failed to explain how the answers to these questions would be incriminating.

On November 1, 1990, the Trustee's Motion was heard by the Bankruptcy Court. The Trustee's attorney and the attorney for Semifora argued that the Debtor must specify with respect to each individual area of questioning why the answers would furnish a link in the chain of evidence necessary for criminal prosecution in Switzerland.

In early November, the Trustee and the Debtor filed post-hearing briefs on the question of the effect of a pending extradition treaty between the United States and Switzerland [1] and on the application of the Fifth Amendment in the context of foreign criminal proceedings. The Debtor's brief contended that her assertion of the Fifth Amendment was proper even in the absence of an extradition treaty, but requested time to obtain formal evidence of the pending treaty.

On December 4, 1990, the Bankruptcy Court issued its Order Compelling Debtor to Testify. It found that Debtor had failed to demonstrate a real and substantial fear of foreign prosecution. There was no indication, said the court, that the yet unratified treaty would pose a substantial threat of extradition. As an alternative basis for its holding, the court held that even without a treaty in force, the Debtor had failed to establish a sufficient nexus between the criminal charges and the answers to the questions asked by the creditors.

On December 7, 1990, the Debtor filed her Notice of Appeal. The Bankruptcy Court, on December 10, 1990, denied the Debtor's motion for stay pending appeal. On December 12, 1990, this Court granted the Debtor a stay pending appeal.

Oral argument on the appeal was heard before this Court on January 30, 1991. At that hearing, the Court directed that the examination of Debtor be recommenced to determine the precise scope of her refusal to testify and thereby narrow the areas of dispute.[2] That examination was conducted

---

1. Specifically, the issue was whether the pending treaty, which would make extradition more likely, was at such a stage in its passage as to constitute a veritable threat to the Debtor.

2. The Court also decided on January 30, 1991 to withdraw, in part, the reference of this bankruptcy case pursuant to 28 U.S.C. § 157(d). This withdrawal encompassed both the conduct of the § 341 examination and any other occasion for which compelled testimony of the Debtor was sought, including examination pursuant to Bankruptcy Rule 2004. It was the opinion of this Court that the constitutional issues surrounding Debtor's assertion of her right against self-incrimination were more appropriately addressed, in the first instance, by a Judge ap-

on February 27, March 5, and March 6, 1991.

The Debtor continued to assert the Fifth Amendment privilege in response to certain questions. These questions concerned, generally: (1) the identities of persons associated with Romtex; (2) meetings in Zurich in 1982 and 1983 and related questions; (3) the identity of Benefactor (a person linked to Debtor and the Romtex Group); (4) the identity of Mr. Perino (a person associated with the Union Bank of Switzerland); (5) a meeting in Bermuda in 1984 or 1985; and (6) a loan for purchase of wool cashmere cloth.[3] The Debtor was also asked, in connection with some of these questions, why she claimed that she was entitled to Fifth Amendment protection. She refused to answer these questions as well.[4]

### DISCUSSION

In addressing the Fifth Amendment issues presented here, the Court will, broadly speaking, engage in a two-part analysis: (1) As a threshold matter, do the questions at issue give rise to a real and substantial fear of prosecution such that the privilege against self-incrimination is even implicated; (2) If so, may the Fifth Amendment's privilege against self-incrimination be effectively invoked where the threat of criminal liability arises from prosecution by a foreign, as opposed to an American, government.

### A. REAL AND SUBSTANTIAL RISK OF FOREIGN PROSECUTION

Many opinions, citing the principle that a court will not decide a case on a constitutional basis if there exists another basis for decision, *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), have simply held the privilege inapplicable because the claimant could show no real and substantial fear of foreign prosecution.[5]

In *Zicarelli v. New Jersey State Com. of Investigation,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), one of the few cases even to address the general questions at issue here, the Supreme Court held that without a real and substantial fear of foreign prosecution a claimant to the Fifth Amendment may be compelled to testify. *Id.* 92 S.Ct. at 1675. In *Zicarelli,* the claimant was subpoenaed by the New Jersey State Commission of Investigation to testify about organized crime, racketeering, and political corruption in Long Branch, New Jersey. In the course of several appearances before the Commission, he invoked his privilege against self-incrimination, and continued to assert his privilege even after having been granted immunity, arguing that he would be subject to a real and substantial risk of foreign prosecution from which a domestic grant of immunity would not protect him. To support his claim, he submitted a number of newspaper articles calling him the "foremost internationalist" in organized crime and detailing his alleged participation in unlawful activities in Canada and the Dominican Republic.

The Supreme Court held that while the answers to these questions, in the abstract, might have led to fear of a foreign prosecution, this fear was groundless in the context in which the questions were posed. As stated by the Court: "But the context in which a question is asked imparts additional meaning to the question, and clarifies what information is sought." Specifi-

---

pointed pursuant to Article III of the United States Constitution. *See* "Order Withdrawing Reference, In Part," January 30, 1991.

**3.** In a letter dated July 3, 1991 from the Debtor's counsel, the Debtor indicated that she would be willing to answer the creditors' question concerning the loan for certain wool cashmere cloth. Moreover, the Debtor also indicated that she would answer one of five questions concerning her activities in Bermuda in 1984 or 1985.

**4.** The questions at issue, excerpted from the deposition, are appended at the end of this Opinion.

**5.** *See e.g., Zicarelli v. New Jersey State Com. of Investigation,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052 (3d Cir. 1988); *In re Sealed Case,* 825 F.2d 494 (D.D.C.1987); *United States v. Chevrier,* 748 F.2d 100 (2d Cir.1984); *In re Gilboe,* 699 F.2d 71 (2d Cir.1983); *Nigro v. United States,* 705 F.2d 1224 (10th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

cally, the Commission was looking for answers to the claimant's domestic activities and had no interest in his foreign transactions. The claimant could have truthfully answered the questions asked without divulging information which would have subjected him to foreign prosecution. *Id.* at 1676.

■ More recently, the Court of Appeals for the Second Circuit addressed this issue in *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116 (2d Cir.1982). The federal prosecutor granted Flanagan use immunity [6] and asked that he testify before a federal grand jury on a plot to smuggle guns from the United States to Great Britain. Flanagan refused, claiming that even with immunity the information requested could be used to incriminate him under the criminal statutes of Northern Ireland and the Republic of Ireland. The Second Circuit rejected this claim. It avoided discussion of the scope of the privilege, however, by ruling that Flanagan did not face a real and substantial risk of foreign prosecution.

■ In reaching this conclusion, the court set forth several factors [7] to be considered when deciding whether the claimant's responses would be incriminating in a foreign prosecution. This Court distills these factors into a four-part test: (1) whether there is an existing or potential foreign prosecution; (2) whether there is a likelihood that the testimony would be disclosed to the foreign government; (3) whether the likely testimony would initiate or further the prosecution so as to potentially subject the claimant to criminal liability, i.e., whether there is a nexus between the testimony sought and the prosecution; and, (4) whether such prosecution would entitle the foreign government to have the claimant extradited from the United States.[8]

The Second Circuit found that Flanagan did not face a real and substantial risk of foreign prosecution. There was no present or prospective prosecution against him; the questions asked of him concerned primarily domestic activities; the possible crimes involved in the testimony would not serve as a basis for extradition to Ireland or the United Kingdom; and, it was unlikely that the grand jury testimony would be directly or indirectly communicated to the relevant authorities in Ireland or the United Kingdom. *Flanagan,* 691 F.2d at 124. The opinion concluded by observing:

> In addition, the district court has the discretionary power to minimize any risk of disclosure by ordering that additional protective measures be taken, such as sealing the transcript on the condition that it will not be disclosed to third persons without the court's permission.

*Id.*

### 1. EXISTING FOREIGN PROSECUTION

The posture of the instant case differs factually in important respects from *Flan-*

---

6. "Use immunity prohibits witness' compelled testimony and its fruits from being used in any manner in connection with criminal prosecution of the witness." *Black's Law Dictionary* (5th ed.). Use immunity will not prevent a prosecutor from bringing evidence against a claimant so long as that evidence was culled independently of the claimant's testimony.

7. In particular, the court asked:

whether there is an existing or potential foreign prosecution of him; what foreign charges could be filed against him; whether prosecution of them would be initiated or furthered by his testimony; whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and whether there is a likelihood that his testimony given here would be *disclosed to* the foreign government.

*Flanagan,* 691 F.2d at 121.

8. Although this Court is not bound by the test set forth by the Second Circuit in *Flanagan,* the Court finds the factors identified by the Second Circuit therein to be among those most relevant to disposition of the threshold Fifth Amendment inquiry as to whether there are, in fact, true Fifth Amendment self-incrimination issues even implicated in an assertion of the privilege. However, there is nothing in *Flanagan* to suggest that all these factors need be satisfied. Rather, the test was set forth as an example of the questions that a court might wish to ask when handling this issue: "... the court in resolving this issue must then focus *upon such questions as....*" *Flanagan,* 691 at 121 (emphasis added). Therefore, this Court will examine the four factors set forth, but will not require that the Debtor fully satisfy each factor in order to convince the Court that she risks a real danger of prosecution. Rather, it will weigh the totality of the circumstances.

*agan.* First, the Debtor and the Trustee have stipulated that there is a criminal investigation pending against the Debtor in Switzerland. It is similarly undisputed that a warrant has been issued for the Debtor's arrest in Switzerland. While, strictly speaking, this state of affairs might not qualify as a pending prosecution, it seems reasonably clear from the record that, were the Debtor to return, or be returned, to Switzerland, she would face a real risk of being apprehended and implicated in a criminal prosecution.[9] Therefore, it appears to the Court that the Debtor satisfies the first level of inquiry.[10]

### 2. DISCLOSURE OF TESTIMONY TO FOREIGN GOVERNMENT

■ The second hurdle is similarly surmounted by the Debtor. Both parties have stipulated that Semifora, a creditor in this case, is the complainant in the Swiss proceeding pending against the Debtor or played some role in bringing the matter to the Swiss authorities. Therefore, it seems likely that, were the Debtor to reveal some incriminating evidence to Semifora at a Chapter 11 meeting, this information would, directly or indirectly, come to the attention of the relevant Swiss authorities.[11]

### 3. NEXUS OF TESTIMONY TO FOREIGN PROSECUTION

■ The third factor is really at the heart of the instant motion. The point of inquiry is whether, and to what extent, there is a nexus between the content of the answers sought and the potential Swiss criminal prosecution. If the answers to the proposed questions would not be incriminating, the Debtor has no reason to avoid a response, even if threatened with criminal prosecution.

This factor actually requires two separate analyses. First, the Court must determine the extent to which the Debtor must justify her invocation of the privilege. Second, the Court, examining the proffered justification and the questions at issue, must decide whether there is an adequate nexus between the truthful answers to the questions and the Swiss investigation.

The Debtor, of course, is in the best position to explain exactly how and why her answers would incriminate her. But, in so explaining, she might well be forsaking the precise benefits she desires under the privilege. Therefore, the Court must find a balance between the amount of information needed to decide whether there is a nexus, and the amount of information which would render meaningless the privilege she claims.

■ The Supreme Court, in *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), established the standard to be used in making this determination. First, it held that the court, and not the witness, would be the ultimate arbiter

---

**9.** The facts which served as a basis for this determination are more fully discussed *infra.*

**10.** This determination is supported by a letter, in German with an accompanying English translation, proffered at the August 2, 1991 hearing by the Debtor's counsel. That letter, written by Mr. Ochsenbein, a Zurich prosecutor, to Mr. Wehrli, the Debtor's Swiss attorney, denies the Debtor's request for free conduct to Switzerland. The content and tone of the letter suggest that the Zurich authorities would have a keen interest in commencing a criminal proceeding against the Debtor. It states, in relevant part:

> Your clients are accused of crimes which enabled them and their companies to enrich themselves illegally of around SFR20 million and which created corresponding damage. They have therefore to expect custodial sentences in excess of one year.

The Court is cognizant that this letter has not been authenticated. However, for the sole purpose of satisfying the *Flanagan* test, this Court believes that it may consider the letter as one of several indicia of the risk of prosecution.

**11.** Placing the testimony under seal and ordering the parties not to disclose it to third parties are not satisfactory safeguards. First, counsel for the Trustee indicated that he did not believe this would be either a workable or desirable approach. Second, as a practical matter, it would be difficult, if not impossible, for the Court to police such an order once the matters were in controversy in Switzerland. Third, such an approach would only put off until later more difficult questions when either the Swiss government or the creditors requests this Court to permit the testimony to be disclosed and used.

as to whether the privilege would apply. The claimant of the privilege may not escape testifying simply by stating that the information is privileged. Yet the claimant need not explain in detail the rationale for his reticence. Rather a balance, favoring the claimant [12], is to be struck. The Court said,

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Hoffman*, 341 U.S. at 486–87, 71 S.Ct. at 818–19.

■ The Sixth Circuit shed more light on this test in *In re Morganroth*, 718 F.2d 161 (6th Cir.1983). It outlined two situations in which the privilege could properly be claimed, and established distinct tests for each. The first situation involves an answer which, on its face, calls for the admission of a crime or furnishes a link in the chain of evidence needed to prosecute. *Id.* Even if the information, seen in a vacuum, appears innocent, the privilege is justified if, in light of other facts already developed, it appears to present a danger of prosecution. In such a case, the witness need only assert the privilege and identify the nature of the criminal charge or supply sufficient facts so that a particular criminal charge can be reasonably identified by the court. *Id.*

In the second situation, however, the questions, on their face and in relation to other facts, appear to call for only innocent answers. In this instance, the court may require that the witness

> supply personal statements under oath or provide evidence with respect to each question propounded to him to indicate the nature of the criminal charge which provides the basis for his fear of prosecution and, if necessary to complement nontestimonial evidence, personal statements under oath to meet the standard for establishing reasonable cause to fear prosecution under this charge.

*Id.* at 170. Counsel may make arguments, but the facts must come from the claimant. *Id.* This higher standard is necessary because often only the claimant possesses the information upon which the court must make its determination; absent the threat of the penalty of perjury, the witness may be tempted to try to mislead the court.

Based on a careful review of the record, the Court believes that the Debtor's situation is closer to that set forth in the first *Morganroth* category. In light of facts established by the parties, it seems clear that a truthful answer to the questions posed by the creditors could well result in injurious disclosures.[13] Thus, the information supplied by the Debtor [14] is satisfactory to enable the Court to determine

---

**12.** On this point, the Court said: "This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman*, 341 U.S. at 486, 71 S.Ct. at 818.

**13.** The Trustee, however, disagrees, referring to *Flanagan* for the proposition that the Debtor must make a "particularized showing" that the testimony would be incriminating in a foreign court. Absent this, the Trustee argues, the witness "could use the privilege as a virtual license to frustrate almost any criminal investigation having international consequences, however peripheral or tangential." *Flanagan*, 691 F.2d at 121. This tactical use of the privilege would run counter to the principle that the public has the right to every man's evidence. *Id.*

While this Court agrees with the Second Circuit as to the potential for abuse inherent in the invocation of the privilege, there are important

factual differences between the instant case and *Flanagan*. As noted above, in *Flanagan*, the witness was facing no current or prospective prosecution, nor was there even any pending criminal investigation of his activities in Ireland. In other words, the probability of prosecution was far more attenuated. Further, the questioning of the witness before the grand jury was limited to his domestic activities. There was also less likelihood, given the government's assurances that it would not reveal witnesses' testimony to the U.K. or the Republic of Ireland and the protections of Rule 6(e) of the Federal Rules of Criminal Procedure insuring grand jury secrecy, that the testimonial information would reach foreign authorities.

**14.** In her response to the Trustee's May 3, 1991 Motion for Order Compelling Debtor to Testify, the Debtor addressed each question at issue and gave reasons for her invocation of the Fifth Amendment privilege.

whether the nexus between the answers to the questions and the risk of foreign prosecution has been satisfied.

■ The Court must now review the questions in dispute, in the context of the status of the Swiss criminal investigation, to determine whether the answers to these questions would advance the investigation in such a way as to be incriminating to the Debtor. To do so, it must decide whether, by the use of reasonable inference it can conceive of a sound basis for the claimant's reasonable fear of prosecution. In making this determination, the Court finds guidance in two appellate decisions. The Sixth Circuit in *In re Morganroth* stated, in relevant part,

A witness presents sufficient evidence to establish a foundation for the assertion of the privilege and shows a real danger of prosecution if it is not perfectly clear to the court "from a careful consideration of all of the circumstances in the case, that a witness is mistaken, and that the answer[s] cannot possibly have such a tendency to incriminate." Stated differently, sufficient evidence is presented by a witness if a court can, by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution.

*Morganroth,* 718 F.2d at 169 (*quoting Hoffman v. U.S.,* 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951)) (citation omitted). The Ninth Circuit also discussed this issue in *Hashagen v. United States,* 283 F.2d 345, 348 (9th Cir.1960):

The "guarantee against testimonial compulsion" embodied in the Fifth Amendment to the United States Constitution must be liberally construed and broadly applied in order to sustain fully the basic right it was designed to protect. It is not merely an admission of guilt in a federal crime, or of a probative fact which, with others, may aid in establishing guilt, that may be withheld; the privilege to remain silent may also be validly asserted where the answer to a question would be likely to provide a lead or clue to a source of evidence of such crime, and thus furnish a means of securing one or some of the "links in the chain of evidence" required for federal prosecution of the witness.

The Swiss investigation involves allegations that the Debtor procured a loan for her company, Jolland, by misrepresenting to Semifora the value of Jolland's accounts receivable. A translated press release [16] from the Cantonal Department for Commercial Offenses of the Zurich District Attorney's Office dated April 11, 1991 speaks of the Debtor's business transactions in Switzerland and the pending investigation of certain loan transactions. It notes that the Romtex Group, centered in Southeast Asia, is comprised of hundreds of companies (which the release did not identify) and is thought to be a giant, secret clothing cartel managed by the Debtor. Jolland, based in Hong Kong, was once controlled by the Debtor and was engaged in a profitable business with the Romtex Group. According to the release, the Debtor also controlled Romtex AG and Ircon AG. Ircon AG was the investment company for payments which Romtex AG owed the Debtor.

Semifora granted the Debtor a total of four loans. First, in June 1987, Jolland received about seven million Swiss francs to buy goods. An "exchange asset" of 8.4 million Swiss francs served as security. Second, in July 1987, Ircon AG received a credit of about 1.4 million Swiss francs. As security, Semifora had, among other things, a guarantee from the Debtor that Ircon AG would hand over its claims against Romtex AG. Third, in November

16. The Debtor claims that this release is admissible under Rule 44.1 of the Federal Rules of Civil Procedure. However, the Debtor misapplies this Rule. The evidence that the Debtor submits before this court is factual, not legal. The Debtor does not presume to speak to the law of Switzerland, but rather attempts to make the factual showing that the investigation against her is proceeding.

However, under the broad power to examine all aspects of the case before deciding whether information is incriminating, *Hoffman,* 341 U.S. at 486–87, 71 S.Ct. at 818–19, and solely for the purposes of this discussion, this Court will assume that the information contained in the translation of the press release is essentially accurate.

1987, the loan to Jolland was increased to 18 million Swiss francs. As security, the "exchange asset" was renewed and Romtex AG gave up its accounts receivable to the bank. Fourth, from October 1987 to April 1988 the Debtor overdrew her checking account in the amount of 340,000.00 Swiss francs.

According to the release, after February 1988 it was discovered that the security of the now insolvent Romtex AG was not covered, that the accounts receivable did not exist, and that the location of the goods was not known. An investigation revealed that Romtex AG, Ircon AG, and a series of other companies were fictitious, and that the balance sheet of Jolland had been falsified. Also, the written reports to Semifora were incorrect.

The release ends by noting that several people, some under warrant for arrest, are sought with respect to further offenses and that the case is only temporarily closed.

The first set of questions asked by the creditors concerns, generally, the identities of persons associated with Romtex. Based on the record before the Court, it is quite likely that, at the very least, information concerning these people could have the effect of facilitating and narrowing the investigation of the Zurich District Attorney.

Romtex AG's accounts receivable were pledged as security on one of the loans from Semifora to the Debtor. The District Attorney is investigating whether the loans were fraudulently obtained by using non-existent accounts receivable. Should the Debtor identify people or companies associated with the Romtex Group, the District Attorney would then be able to investigate and interview these people in an attempt to determine the validity of the obligations owed to Romtex AG by the Romtex Group. It is these obligations which, in turn, comprise the accounts receivable owed to Jolland by Romtex AG, and which were pledged by Jolland as security on the loan from Semifora.

The second set of questions concerns the Debtor's meetings in Zurich in 1982 and 1983. These meetings were between the Debtor and persons associated with the Romtex Group, including her Romtex contact. For the same reasons set forth above, the Court believes that disclosure of the identity of the Romtex contact and others with whom the Debtor met in Zurich would enable the District Attorney to determine the identities of those persons comprising the Romtex Group. This knowledge would further enable the prosecutor to learn or confirm information concerning Jolland's accounts receivable.

The third set of questions concerns the identity of the Debtor's "benefactor," the person who introduced the Debtor to the Romtex cartel. Disclosure of the identity of the benefactor would better enable the prosecutor to determine the identities of the members of the Romtex Group.

The fourth set of questions concerns Mr. Perino, a banker for Romtex AG. Once again, the identity of Mr. Perino and those associated with him may well lead the District Attorney to the discovery of the members of the Romtex Group.

The fifth, and final, set of questions concerns a meeting in Bermuda between the Debtor and an unidentified person to discuss a matter apparently related to the relationship between Jolland and the Romtex Group. Although the facts about this meeting are unclear, the possibility that information about the meeting might elucidate for the prosecutor the connection between Jolland and Romtex is sufficient to satisfy the test set forth above.

In sum, under the broad standard set forth in *Hoffman, Morganroth,* and *Hashagen,* the Court finds that the Debtor has adequately established that the answers to the creditors' questions "would be likely to provide a lead or clue to a source of evidence" of possible criminal behavior, thus providing a sufficient nexus to the potential Swiss criminal prosecution to sustain the invocation of the privilege. Thus, the Court believes that the Debtor has satisfactorily met the third level of inquiry.

### 4. EXTRADITION TO SWITZERLAND

#### (a) RIGHT TO TRAVEL

■ The final prong of inquiry concerns the possibility of extradition. Before ad-

dressing this issue, however, the Court will handle the Debtor's related claim that answering the questions will inhibit her right to international travel. The Court rejects this argument outright. First, as there is a pending warrant for her arrest, she could be apprehended and questioned upon return to Switzerland whether or not she answers the questions. *See In re Grand Jury Subpoena of Flanagan*, 691 F.2d at 124, n. 7. Second, it defies logic to suggest that because, in carrying out the mandates of our judicial system, the Court may place the Debtor in the position where travel to some countries would place her in jeopardy of prosecution or extradition, it therefore may not compel her to answer questions in a domestic bankruptcy proceeding. Should she decide to return to Switzerland, she may or may not be prosecuted. The Court must apply the law without concern for the travel plans of the claimant.

Though the Supreme Court has not addressed this issue in the context of the factual situation today before this Court, it has ruled on the right to travel abroad in contravention of legislative or executive authority forbidding such travel. Initially, in *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the Supreme Court held that Congress had not given the Secretary of State discretion to deny a passport to a person because of his Communist political associations and activities. The decision held free international travel to be an "important aspect of the citizen's 'liberty.'" *Id.* at 126, 78 S.Ct. at 1118.

Subsequent decisions by the Court, however, have limited *Kent*'s broad construction of the right. In *Califano v. Aznavorian*, 439 U.S. 170, 176, 99 S.Ct. 471, 474, 58 L.Ed.2d 435 (1978), the Court held that a mere rational justification would suffice for Congress to limit international travel. It observed the "crucial difference between the freedom to travel internationally and the right of interstate travel," which it had earlier found to be "virtually unqualified." *Griffin v. Breckenridge*, 403 U.S. 88, 105–06, 91 S.Ct. 1790, 1799–01, 29 L.Ed.2d 338 (1971); *United States v. Guest*, 383 U.S. 745, 757–58, 86 S.Ct. 1170, 1177–78, 16 L.Ed.2d 239 (1966).

More recently, the Court upheld the President's right to revoke, without a hearing, the passport of a citizen whose activities in a foreign country would likely harm American security interests. *Haig v. Agee*, 453 U.S. 280, 308–09, 101 S.Ct. 2766, 2782–83, 69 L.Ed.2d 640 (1981). The Court also sustained a Treasury regulation effectively banning travel to Cuba for foreign policy reasons by forbidding diversion of hard currency to that country. *Regan v. Wald*, 468 U.S. 222, 242–43, 104 S.Ct. 3026, 3038–39, 82 L.Ed.2d 171 (1984).

The District Court for the Eastern District of New York did obliquely address this issue in the context of the Fifth Amendment privilege. In *In re Flanagan*, 533 F.Supp. 957 (E.D.N.Y.), *rev'd, In re Grand Jury Subpoena of Flanagan*, 691 F.2d 116 (2d Cir.1982), the court stated that the witness had a reasonable fear of prosecution. While observing that the witness probably could not be extradited to Northern Ireland, the desired testimony, said the court, would impede his desire to travel:

> More importantly, the witness claims that he is a citizen of the Republic of Ireland and has indicated that he travels to Ireland once a year. Refusal to extradite would be little solace to one who might wish to travel to his native country.

*Flanagan*, 533 F.Supp. at 965. The Second Circuit rejected this contention but did so on the basis that, in that case, the witness had no reason to fear foreign prosecution even if he returned to Ireland. Thus, the court of appeals did not directly address the issue of whether a witness may have a real and substantial fear of foreign prosecution even absent the possibility of extradition. *Flanagan*, 691 F.2d at 124.

Other circuits have noted, but not discussed, this issue. In *In re Tierney*, 465 F.2d 806 (5th Cir.1972), *cert. denied* 410 U.S. 914, 93 S.Ct. 959, 35 L.Ed.2d 276 (1973), the court remarked in dicta that a refusal by the government to extradite would provide little consolation to the New York witnesses should they wish to travel to Great Britain. *Id.* at 812. The Ninth

Circuit, however, apparently assuming that there was no right to international travel in the context of the privilege, said,

> It is no answer to Lemieux's fears that he can avoid foreign prosecution by giving up travel to or through a foreign country that may prosecute him. Assuming that the burden on his traveling choice is permissible, it is a choice that he may never have. Extradition proceedings could force him to travel to Mexico or Columbia.

*In re Federal Grand Jury Witness*, 597 F.2d 1166, 1169 (9th Cir.1979). Finally, in discussing the threat to the witness from a voluntary return to the foreign country threatening prosecution, the D.C. Circuit concluded, "We only add that it [privilege] does not protect against dangers voluntarily assumed." *In re Sealed Case*, 825 F.2d 494, 497 (D.C.Cir.), *cert. denied* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987).

There has, thus, been no authoritative discussion of this issue. However, reasoning by analogy, if the Congress or President is able to proscribe a person's travel for a rational justification, this Court should be able indirectly to limit the Debtor's voluntary travel abroad when such travel would prevent the collection of evidence in a judicial proceeding. Moreover, the court is not actually prohibiting the Debtor's travel. Were the Court to compel the testimony, it would simply be requiring her to abide by the laws and rules of this country. The choice of whether to travel or not to travel would still rest with the Debtor. The effect of her compelled testimony is but one factor she would have to weigh. Simply because, on account of the Debtor's allegedly illegal actions abroad, the compelled testimony may result in a more effective foreign prosecution, the Debtor is not relieved of her testimonial obligations under our judicial system.

## (b) EXTRADITION TREATY

█ Without the possibility of extradition, the Debtor would have little reason to fear a criminal prosecution, and, thus, would lack a justification for asserting the privilege. The current U.S.–Swiss extradition treaty contains an exception for the citizens of the extraditing country.[17] It states that neither country is required to extradite its own citizens. Relying on the Supreme Court's decision in *Valentine v. United States*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), the Trustee claims that the current U.S.–Swiss extradition treaty undermines the Debtor's reasonable fear of prosecution. That case held that a similar exception in the French–U.S. extradition treaty prohibited the U.S. from extraditing United States citizens. The Debtor, while claiming that the treaty exception is permissive, not mandatory, seems to concede this point and instead relies on a new extradition treaty between the United States and Switzerland which would permit extradition of each country's own citizens.[18] That treaty has been negotiated but not yet ratified by the relevant legislative bodies of each country. The Debtor contends that the likelihood of ratification in the future is sufficient to create a reasonable fear of extradition. In a letter dated July 29, 1991, the Debtor informed the Court that, according to the State Department, consideration of the treaty was delayed because the Senate Foreign Relations Committee was occupied with the Gulf War, but that it will be brought before the Committee after Labor Day, September 2, 1991. The Trustee counters that ratification is not certain and, even if it were, the date of ratification is too speculative to be relied on by this Court.

Once the new treaty is ratified, the Debtor's case must still meet certain require-

---

**17.** Article I states: "Neither of the two Governments, however, shall be required to surrender its own citizens." Extradition Treaty, May 14, 1990, U.S.–Switzerland. 31 Stat. 1928 at 1929.

**18.** As the parties have not placed the scope of the current extradition treaty in contention, the Court need not rule on the possibility of the Debtor's extradition under it. The Court would

only note that the logic of *Valentine*—that absent an affirmative grant of power to extradite its own citizens, a nation is proscribed from doing so—is less than compelling. On the face of the plain language of the exception in that Treaty, it would seem that both the United States and the foreign country could voluntarily extradite their own citizens to the other country.

ments before it will be considered ripe for action. First, the Debtor would have to be charged with or found guilty of an "extraditable offense." As of this date, the Debtor has not been charged with a crime in Switzerland. Moreover, under the treaty, the United States is only obligated to extradite persons for acts committed outside Swiss territory if those acts would be punished in the United States under similar circumstances. Finally, the treaty restricts extraditable offenses to those punishable under the laws of both countries by a deprivation of liberty for a period exceeding one year.

It appears highly likely that the treaty will eventually be ratified. By this time, the Debtor may have been charged in Switzerland with a criminal offense. Next, it would appear that the charges of fraud and forgery with which the Debtor is threatened in Switzerland are offenses which would be punished under similar circumstances in the United States. Finally, because both fraud and forgery are subject in the United States to a maximum penalty of five years imprisonment, they would be extraditable crimes under the treaty.

The totality of information now on the record leads the Court to believe that there is a strong possibility that the Debtor could be extradited to Switzerland now or sometime in the future. The fact that extradition is not certain or is somewhat remote in time is not determinative. This is a particularly important consideration in weighing the interests at stake. If the Debtor is compelled to testify and is subsequently indicted and extradited to Switzerland, it is too late to protect her privilege against self-incrimination. By this point, she would already have suffered irreparable harm.

There is one final issue neither addressed in *Flanagan* nor in the parties' briefs: Whether a Swiss equivalent of the privilege would serve to prevent information gleaned from a domestic bankruptcy proceeding from being submitted in a Swiss criminal prosecution. If it could be definitely shown that, even were the Debtor to be extradited to Switzerland to face a criminal prosecution, the information in dispute would not be admissible in a Swiss court, the Court would consider this in examining the extent of the fear of foreign prosecution.

Reference to the Swiss Federal Constitution is unavailing. There is no equivalent to our privilege, but Article 4 does offer protection to Swiss citizens from arbitrary ("Willkur") actions by individual Cantons. On its face, this would not prevent a Canton from using information gleaned from a foreign judicial proceeding in a domestic prosecution.

The more pertinent reference, however, is to the procedural rules of the Canton of Zurich. Under Article 64, individual Cantons are granted the right to promulgate rules of evidence and judicial administration in criminal cases. The Debtor's Swiss attorney, Mr. Bernard Wehrli, responding to the Debtor's request for information on this subject, wrote that under § 131 of Zurich's Criminal Process Law, the Debtor would have a right against self-incrimination and a right to keep silent in the face of criminal proceedings in a Swiss court of law. With respect to evidence already gained through judicial proceedings in the United States, however, Swiss law does not seem to bar its use. According to Mr. Wehrli, the recent trend in Swiss law is to bar illegally obtained evidence only if it could not, in the judgment of the court, have been obtained legally. Evidence compelled by a United States court would not be judged to have been illegally obtained. Mr. Wehrli concludes by noting that, to his knowledge, no other Swiss statutes or international treaties of any kind would bar this kind of evidence. Although this analysis is not determinative for the Court in reaching its decision, it is useful.

The above analysis reveals that, when all the interests are weighed, the Debtor has satisfied all four factors of the test derived by this Court from *In re Grand Jury Subpoena of Flanagan* and that she has a real and substantial fear of foreign prosecution. Therefore, it is necessary to proceed to an analysis of the applicability of the Fifth Amendment privilege to foreign prosecutions.

## B. SCOPE OF THE FIFTH AMENDMENT PRIVILEGE

 The issue presented by this case—whether the privilege against self-incrimination may be validly invoked where the threat of prosecution is by a foreign government rather than a domestic government—posits for this Court one of those relatively rare instances in judicial decision-making in which precedent provides no compelling answers in one direction or the other, but rather requires inquiry into, and analysis of, the philosophy and policy that underlies and supports one of this nation's most widely accepted and fundamental constitutional rights. Indeed, because there do not appear to be any definitive precedential beacon lights to clearly illuminate a decisional path, it seems to the Court that the inquiry must begin in the first instance with the history and underlying tenets of the privilege.

### 1. HISTORY OF THE PRIVILEGE

The Fifth Amendment privilege probably originated in ancient Talmudic law. N. Lamm, *The Fifth Amendment and its Equivalent in Jewish Law*, 17 Decalogue 1, 12 (1967). However, some commentators contend that the nexus between the ancient Jewish law and the modern privilege is tenuous at best. L. Levy, *Origin of the Fifth Amendment Right Against Self-Incrimination* at 439–41 (2d ed. 1986) (hereinafter "Levy") (concluding that there is no proof that Talmudic references had any influence on the development of the privilege). Nevertheless, it is undeniable that the Rabbinic courts recognized a right not to testify against oneself very similar to the privilege. As noted by Professor Levy:

> Woven into the texture of this criminal procedure of the old Rabbinic courts was the maxim *ein adam meissim atsmo rasha*, the Hebrew equivalent of *nemo tenetur seipsum tenetur*. Literally translated it means, a man cannot represent himself as guilty, or as a transgressor.... That rule was an absolute and could not be waived or relinquished.

*Id.* at 434.[19] The theological and jurisprudential underpinnings for this rule are somewhat unclear. It may have been that a self-accusatory statement was considered untrustworthy or that a person who would incriminate himself was not considered of sound mind, and, thus, could not form the *intent* to incriminate himself. *Id.* at 438. Or, it may have been that self-incrimination in a criminal matter was likened to attempted suicide, a practice prohibited under Jewish law on the theory that the individual's body belongs to God and not to the individual. *Id.* at 439. Despite the ambiguity of its genesis, it is clear that this rule was a major tenet of ancient Jewish law. The connection to medieval English law, however, is less than clear.

It is almost certain that the idea behind the privilege was in existence in medieval England. The privilege originally served as a shield against inquisitorial proceedings by ecclesiastical and prerogative courts, such as the Star Chamber and the High Commission. *See generally* Levy, *supra*, p. 341; Urick, *The Right Against Compulsory Self–Incrimination in Early American Law*, 20 Colum.Hum.Rts.L.Rev. 108 et. seq. (1988) (hereinafter "Urick"); Fausett, *Extending the Self–Incrimination Clause to Persons in Fear of Foreign Prosecution*, 20 Vanderbilt Journal of Transnational Law 699, 702 (1987) (hereinafter "Fausett"); Friendly, *The Fifth Amendment Tomorrow*, 37 Cin.L.Rev. 671, 677–79 (1968) (hereinafter "Friendly"). These bodies would compel an accused to swear an oath, called an oath *ex officio*, to give true answers to whatever questions might be asked. The oath was taken by the accused without formal charges or without knowing the crime for which he was being questioned. Following the oath, the accused was asked a series of questions designed to extract a confession or a contradiction.

To say the least, this practice occasioned discomfort. In commenting on a popular and influential book on the oath *ex officio* written in the late sixteenth century, Professor Levy writes:

> and if he attempted to do so, that confession was not admissible. Levy, *supra*, at 436–37.

---

**19.** Indeed, so fixed was the rule that an accused was not even permitted to confess to a crime,

Threatened with punishment, they [the accused] appealed to the laws of the realm. Thus every examination, as Foxe reports it, tended to wind up in a dramatic scene in which an honest believer was shown pitting the plain truth of the Word against the super-subtle sophistries of hypocritical churchmen and a loyal subject of the Crown was shown asserting his rights as an Englishman against a papist prelate.

Levy, *supra,* p. 341, at 82. It was this persecution of the individual by the church that seemed to serve as the catalyst for the formation of the privilege. The privilege, then, sprang not from a specific right granted under law, but from a belief in the fundamental unfairness of a court's compelling a citizen to answer questions designed to accuse that citizen of a crime.

In the mid-seventeenth century, the oath *ex officio* was abolished and, at the 1637 treason trial of John Lilburne, the right against self-incrimination was established at common law in a form approaching its modern manifestation. It did not prohibit inquiry or even incriminating interrogatories, but simply permitted the accused to refuse to answer questions "without formal prejudice or penalty." *Id.* at 313. Lilburne's was a political trial, and the English application of the privilege seems to have been intimately associated with political and religious expression and crimes of conscience. *Id.* at 332; Fausett, *supra* p. 341, at 703. As stated by Professor Levy, "In the broadest sense it was a protection not of the guilty, or of the innocent, but of freedom of expression, of political liberty, of the right to worship as one pleased." Levy, *supra,* p. 341, at 332. As soon as the right was secured, it became academic to the accused at the trial stage due to the development of the disqualification for interest of the accused in criminal trials, and of all parties to civil actions, preventing them from testifying under oath. Anyone having a stake in the outcome of a trial was considered to be so tempted to commit perjury that his testimony was disqualified as inherently unreliable.[20] *Id.* at 324. After the promulgation of the disqualification rule, the right's importance for the accused was limited to the preliminary examination, to which it was not statutorily applied until 1848. *Id.* at 325, 329; Friendly, *supra* p. 341, at 678. In the 1640s, the right of the accused to avoid self-incrimination took the form of a rule against coerced or compelled confessions, which emerged as the principal defense against confessions and pleas extracted by torture or compulsion. Levy, *supra* p. 341, at 326–28. The right was broadly construed in other contexts by English courts and, by the end of the English Revolution, pertained to witnesses as well as the accused, and could be invoked merely to avoid defamation of character. Urick, *supra* p. 341, at 115; Levy, *supra* p. 341, at 317.

The development of the right in the American colonies was inconsistent and difficult to trace in the seventeenth century. However, from its first appearance until the drafting of the Constitution, American law steadily adopted the broad construction of the English common law sources. Urick, *supra* p. 341, at 116; Levy, *supra* p. 341, at 333–67. Gradually, as the legal profession expanded in the eighteenth century through English-trained lawyers and English law books, the practice of law, imitative of the English model, became consistent throughout the colonies. Levy, *supra* p. 341, at 368–69. By the time of the American Revolution, in this country, as in England, the right applied to attempts to gain confessions. Urick, *supra* p. 341, at 123. Moreover, also as in England, the usual context for its invocation was a political trial involving crimes of conscience. Levy, *supra* p. 341, at 368–404.

The privilege achieved formal sanction and codification when it was incorporated, without debate, into the procedural protections afforded an accused at criminal trial under the Fifth Amendment to the United States Constitution.

---

**20.** This principle persisted in America until about 1878 and was abolished in England twenty years later. 20 Stat. 30 (now 18 U.S.C. § 3481 (1964)); Criminal Evidence Act of 1898, 61 & 62 Vict., c. 36. See C. McCormick, *Evidence* § 132

## 2. LANGUAGE OF THE PRIVILEGE IN THE BILL OF RIGHTS

The Fifth Amendment of the United States Constitution reads in relevant part:

No person ... shall be compelled in any criminal case to be a witness against himself.

The privilege, thus, protects a person from being compelled in a criminal proceeding to speak against his interests. There is no specification as to the person being compelled; he may be the accused or a witness. *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). Moreover, the language of the clause limits the type of information only in that it must be adverse to the interests of the claimant. As stated by Professor Levy,

The right not to be a witness against oneself imports a principle of wider reach, applicable, at least in criminal cases, to the self-production of any adverse evidence, including evidence that made one the herald of his own infamy, thereby publicly disgracing him.

Levy, *supra* p. 341, at 427.[21] Taken alone, then, the language itself seems to favor a broad interpretation of the privilege.

The courts, however, have not uniformly interpreted the clause in this manner. Rather, they have limited its protection to information that may be used in a criminal trial, as opposed to a civil proceeding.[22] They have similarly proscribed invocation of the privilege to prevent against shame, public humiliation, or even physical danger. *See Lefkowitz v. Turley*, 414 U.S. 70, 78–79, 94 S.Ct. 316, 322–23, 38 L.Ed.2d 274 (1973); *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656–57, 32

L.Ed.2d 212 (1972); *Heike v. United States*, 227 U.S. 131, 144, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913); *Brown v. Walker*, 161 U.S. 591, 599–600, 16 S.Ct. 644, 647–48, 40 L.Ed. 819 (1896).

The phrase "in any criminal case" appears to have been an afterthought. James Madison, the author of the original draft proposal of the right, proposed that the right be applied both to civil and criminal proceedings, and to all stages of the legal process. Levy, *supra* p. 341, at 423. His version read as follows: "no person ... shall be compelled to be a witness against himself." *Id.* Madison did not explain his choice either at the time of promulgation or in his later writings, but it is clear from the language chosen that he intended the amendment to encompass the broadest possible formulation of the privilege. *Id.* Madison's proposal almost certainly applied to every stage of a criminal and civil trial, and extended to any other type of governmental inquiry. *Id.*

The version of the amendment that finally passed, unanimously and without discussion, confined the privilege to persons compelled to testify in the context of exposure to criminal liability. It protected any person in the criminal proceeding, witness or defendant, and applied at all stages of the proceeding, from arrest to indictment and trial. *Id.*

Subsequent Supreme Court decisions have further clarified the issue of when, and in which proceedings, the privilege may be invoked. In *Arndstein v. McCarthy*, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920), the Court held that the privilege applied to a witness in a civil action (bank-

---

at 276, n. 2 (1954); Friendly, *supra* p. 341, at 678.

**21.** Professor Levy refers to the Fifth Amendment privilege as a right: "Although the right against self-incrimination originated in England as a common-law privilege, the Fifth Amendment made it a constitutional right, clothing it with the same status as other rights, like freedom of religion, that we would never denigrate by describing them as mere privileges." Levy, *supra* p. 341, at xv. Notwithstanding Professor Levy's valid observation, for ease of reference, the Court will refer to the privilege as "the privilege," "the Fifth Amendment privilege," "the Fifth Amendment," or "the right against self-incrimination."

**22.** Although courts have limited the forum of *use* to proceedings involving criminal liability, they have permitted invocation of the privilege to prevent against *compulsion* in civil trials as well as legislative hearings. This is a necessary expansion. Without it, the privilege would effectively be vitiated by permitting compulsion of testimony in a civil proceeding relating to the same or similar transaction which could then later be used in a criminal proceeding. *See* Note, *The Reach of the Fifth Amendment Privilege When Domestically Compelled Testimony May Be Used in a Foreign Country's Court*, 65 Va.L.Rev. 875, 877–78 (1983).

ruptcy proceeding), and the courts now treat the privilege as protecting a party or witness from compelled testimony in any proceeding, civil or criminal, so long as the information sought could potentially later be used against that person in a criminal proceeding. *Lefkowitz v. Turley,* 414 U.S. 70, 78–79, 94 S.Ct. 316, 322–23, 38 L.Ed.2d 274 (1973); *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924) [23]; Friendly, *supra* p. 341, at 677; Levy, *supra* p. 341, at xii.

### 3. POLICIES BEHIND THE PRIVILEGE

As is evident from the preceding discussion, the Fifth Amendment privilege is not easily reduced to a singular policy or purpose, but is ephemeral and eludes crisp summarization. That the privilege is not easily packaged into one clearly formed policy rationale is a testament to its profound relationship to many of our most cherished ideals.

> "The fundamental value reflected by the Fifth Amendment 'is intangible, it is true; but so is liberty, and so is man's immortal soul. A man may be punished, even put to death, by the state; but ... he should not be made to prostrate himself before its majesty. *Mea culpa* belongs to a man and his God. It is a plea that cannot be extracted from free men by human authority. To require it is to insist that the state is the superior of the

individuals who compose it, instead of their instrument.' "

Levy, *supra* p. 341, at 431 (*quoting* Fortas, "The Fifth Amendment: *Nemo Tenetur Prodere Seipsum,*" Cleveland Bar Association, *The Journal,* XXV (April 1954), 91, at 98–100, *passim* ).[24]

It is undisputed, however, that the privilege both protects the right of the individual from interference by the government and prevents the government from interfering with the individual. In fact, these two facets of the privilege are indissoluble.

The issue before the Court, then, though complicated, can be framed rather neatly: Whether the right not to be a witness against oneself was intended to inhere in the individual as one of those fundamental rights individuals possess under the American Constitution or whether it was intended simply as a limitation upon the United States government in its relations with its citizenry.

It is this Court's firm conviction that the Fifth Amendment, in both language and intent, was meant to inhere in the individual and to be available to the individual to protect against unlawful compulsion by *any* government, regardless of the fortuitous nature of the jurisdiction involved. The Court reaches this view, in great measure, by the very language of the Amendment itself. The entire focus of the language of the privilege, as set forth in the Amendment, is upon the individual and his

**23.** The *McCarthy* Court held:
> The privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it.

*McCarthy,* 266 U.S. at 40, 45 S.Ct. at 17.

**24.** In a negative reference to some of the language used to describe the privilege, Judge Henry J. Friendly wrote:
> It thus is strange how rarely one encounters in the Court's opinions on the privilege the careful weighing of *pros* and *cons,* the objective investigation of how rules of law actually work, and, above all, the consideration whether a less extreme position might not adequately meet the needs of the accused without

jeopardizing other important interests, which ought to characterize constitutional adjudication before the Court goes beyond the ordinary meaning of the language. Instead, the privilege is treated with almost religious adulation, of which Mr. Justice Douglas' footnote reference to the *Halakhah* which "discards confessions in toto, and this because of its psychological insight and its concern for saving man from his own destructive inclination," is a striking recent example.

Friendly, *supra* p. 341, at 681 (citations omitted). This may well be true, but perhaps there is good reason for this. Discussions of this privilege often deal not with matters of pure legal analysis and precedent, but rather with fundamental notions of personal rights and freedoms—subjects which, not surprisingly, occasion philosophical discourse.

fundamental right to be free from governmental overreaching and excess.

In this, the privilege against self-incrimination goes to the very heart of the ideas and beliefs underlying the establishment of this country. At its core, the privilege states that the individual is the master of the government and, thus, the government may not use its power to dominate the individual. As observed by Professor Levy:

> The framers of the Bill of Rights saw their injunction, that no man should be a witness against himself in a criminal case, as a central feature of the accusatory system of criminal justice. While deeply committed to perpetuating a system that minimized the possibilities of convicting the innocent, they were not less concerned about the humanity that the fundamental law should show even to the offender. Above all, the Fifth Amendment reflected their judgment that in a free society, based on respect for the individual, the determination of guilt or innocence by just procedures, in which the accused made no unwilling contribution to his conviction, was more important than punishing the guilty.

Levy, *supra* p. 341, at 432.

Beyond this, the Court is struck by the simplicity and directness of the language chosen by the Framers of the Bill of Rights, and believes that this language ought to be given its plain and ordinary meaning and not be tortured or overanalyzed so as to reach an unintended or artificial result. The language used states: "No person ... shall be compelled *in any criminal case* to be a witness against himself." (Emphasis added.) The language stresses "any" criminal case; it is not limited to certain criminal proceedings, nor is it limited to domestic criminal cases. It says "any" criminal case, not "any domestic criminal case." [25]

### 4. TREATMENT OF THE PRIVILEGE IN THE COURTS

In *Murphy v. Waterfront Com. New York Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964), the Supreme Court held that the privilege against self-incrimination could be invoked to prevent the federal government from using information garnered by state prosecutors in a state prosecution.[26] In so ruling, the Court put its imprimatur on the fundamental nature of the privilege. It was not dependent on the laws or constitution of a particular jurisdiction, but was rather a fundamental right guaranteed by the United States Constitution to all persons under its protections. Justice Goldberg, speaking for the majority, observed that

> the privilege against self-incrimination represents many fundamental values and aspirations. It is "an expression of the moral striving of the community....a reflection of our common conscience...." That is why it is regarded as so funda-

**25.** The Court can not help but remark upon the historical context in which the Amendment, indeed the entire Bill of Rights, was adopted. This new nation had just fought a war to be free from domination of the American people by a foreign sovereign. It is difficult to credit that, given this context, the founders of this new government would have countenanced the compulsion of an American's testimony so that it could be turned over to an English king's prosecutor for prosecution of that American in England. This is particularly clear to this Court when one considers that, if the prosecution were by an American prosecutor, the testimony certainly could not have been compelled. One can hardly believe that our Founders would have formulated a fundamental right which could be exercised on American soil under the American Constitution and which could not be abridged by an American government but which could be abridged for the benefit of a foreign government or monarch.

**26.** In *Murphy*, two witnesses asserted the Fifth Amendment privilege at a hearing before the Waterfront Commission of New York Harbor as part of an investigation of a labor dispute. The witnesses refused to testify even after receiving immunity from prosecution under New York and New Jersey law. They claimed that their testimony might incriminate them in a federal prosecution. The New Jersey Supreme Court upheld a contempt judgment but the Supreme Court reversed. The Court held that "the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Murphy*, 378 U.S. at 77–78, 84 S.Ct. at 1608–09.

mental a part of our constitutional fabric, despite the fact that "the law and lawyers . . . have never made up their minds just what it is supposed to do or just whom it is intended to protect."

*Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596 (citations omitted).

■ In *Murphy*, the Supreme Court set forth many of the fundamental concerns underlying the Fifth Amendment privilege:

The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" *Ullmann v. United States*, 350 U.S. 422, 426 [76 S.Ct. 497, 500, 100 L.Ed. 511 (1956)]. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," *United States v. Grunewald*, 233 F.2d 556, 581–582 (Frank, J., dissenting), rev'd 353 U.S. 391 [77 S.Ct. 963, 1 L.Ed.2d 931 (1957)]; or distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." *Quinn v.*

*United States*, 349 U.S. 155, 162 [75 S.Ct. 668, 673, 99 L.Ed. 964 (1955)].

*Murphy*, 378 U.S. at 55, 84 S.Ct. at 1596–97 (footnote omitted). The most persuasive of these concerns can be distilled into three policies, all related to the fear of governmental abuse or excess: (1) the belief that the government should not force a person to choose among self-accusation, perjury, and contempt; (2) the desire to curb the excesses of prosecutorial zeal; and, (3) the inherent distrust of self-incriminating statements.[27] *See also* Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?* 11 N.Y.U. J. Int'l L. & Pol. 359 (1978).

Justice Goldberg relied, in part, on these policies when he ruled that the privilege applies to a state prosecution when the claimant fears criminal prosecution in a federal proceeding. He observed that the policies would be defeated were a witness able to be "whipsawed" into incriminating himself in a foreign jurisdiction. *Murphy*, 378 U.S. at 54, 84 S.Ct. at 1596. This "whipsaw" effect does not end at our borders but is equally relevant when the prosecuting body is a foreign nation instead of a state.

The Court also reinterpreted precedent, both English and American, to find that the privilege had been misinterpreted by prior Supreme Court decisions. As for the English precedent, Justice Goldberg cited four cases, two decided before the advent of the Constitution and two decided approximately sixty years after. In the two pre-Constitution cases, the English courts held that the privilege applied to foreign prosecutions. In the first case, *East India Co. v. Campbell*, 1 Ves. sen. 246, 27 Eng.Rep. 1010, decided in 1749, the defendant refused to reveal certain information to an English court on the ground that it might subject him to punishment in the courts of

---

**27.** The Debtor has distilled these policies into the following three: (1) avoidance of the cruel trilemma of self-accusation, perjury, or contempt; (2) preservation of the inviolability of the person; and, (3) protection of the innocent. This Court has adopted (1) above. As for (2) and (3), the Court finds that they are incorporat-ed into the Court's policy choices. Preservation of the inviolability of the person is simply another way of stating the desire to prevent the government from violating a person. The protection of the innocent is simply a narrower aspect of the distrust of self-deprecatory statements.

India. The court unanimously ruled that the privilege against self-incrimination protected the defendant from revealing information which could be used to convict him in the other jurisdiction.

The second case is *Brownsword v. Edwards,* 2 Ves. sen. 243, 28 Eng.Rep. 157, decided in 1750. The defendant refused to reveal to the court whether she was lawfully married to a certain person on the ground that if she admitted to marriage, she would be confessing to an act which, though legal under the common law, would render her liable to prosecution in an ecclesiastical court. *Murphy,* 378 U.S. at 58–59, 84 S.Ct. at 1598–99.

In their brief and at oral argument, the creditors attempted to distinguish these cases from the instant case by alleging that the two English cases involved jurisdictions under the legislative sovereignty of the English laws. Yet a review of those opinions suggests that the English courts viewed the trying bodies as distinct and independent entities. The court in *Brownsword* addressed the ecclesiastical court as though it were a separate body: "The ecclesiastical court has conusance of incest in two respects, *diverso intuitu:* first to judge of the legality of the marriage, and to pronounce sentence of nullity; and if they do so, proceeding lawfully and rightfully, it binds all parties, being the judgment of a court having proper jurisdiction of the cause." *Brownsword,* 2 Ves. sen. at 158. In *East India Co.,* the court is even more clear in delineating the Indian court as a separate institution:

> Then the rule is, that this court shall not oblige one to discover that, which, if he answers in the affirmative, will subject him to the punishment of a crime; for it is not material, that, if he answers in the negative it will be no harm; and that he is punishable appears from the case of *Omichund v. Barker* [1 *Atk.* 21], *as a jurisdiction is erected in Calcutta for criminal facts; where he may be sent to government and tried, though not punishable here:* like the case of one who was concerned in a rape in Ireland, and sent over there by the government to be tried, although the court of B.R. here

refused to do it: which was founded on a case in 2 Ven. *for the government may send persons to answer for a crime wherever committed, that he may not involve his country;* and to prevent reprisals.

*East India Co.,* 1 Ves. sen. at 1011 (emphasis added). Thus, the two decisions on this issue before the advent of our Constitution expanded the privilege to prosecutions conducted in non-domestic jurisdictions.

The two later English cases cited by the majority in *Murphy* seem contradictory. In *King of Two Sicilies,* 1 Sim. (N.S.) 301, 61 Eng.Rep. 116, the defendants refused to reveal information in England which, they claimed, would subject them to prosecution under the law of Sicily. The court denied their claim on two grounds: (1) the impossibility of knowing to what extent information proffered in England would subject defendants to criminal penalty in Sicily; and, (2) to be in danger the defendants would have to willfully quit England and go within the foreign jurisdiction. *Id.* at 331, 61 Eng.Rep. at 128.

In *United States v. McRae,* L.R., 3 Ch. App. 79 (1867), the United States sued in an English court for the payment of money allegedly received by the defendant while an agent for the Confederate States during the Civil War. The defendant refused to answer questions on the ground that to do so would subject him to prosecution under the laws of the United States. *Murphy,* 378 U.S. at 61, 84 S.Ct. at 1600. The court upheld the privilege. It held that *King of Two Sicilies,* while correctly decided, was unnecessarily broad and could be limited to the situation where the English court had no way of knowing the possible effect of domestic testimony on a potential foreign prosecution. The Lord Chancellor declined to apply *King of Two Sicilies* to *McCrae* because "the presumed ignorance of the Judge as to foreign law ... [had been] completely removed by the admitted statements upon the pleadings, in which the exact nature of the penalty or forfeiture incurred by the party objecting to answer is precisely stated...." L.R. 3 Ch.App. at 85, and because the property subject to

forfeiture was "within the power of the United States," *Id.* at 87. *See Murphy,* 378 U.S. at 81, n. 1, 84 S.Ct. at 1611, n. 1.

That these cases are contradictory and that they were decided well after the adoption of our Constitution attenuate their probative value here. However, the Court does observe that *McRae,* the latter decision, appears to rest on core Fifth Amendment principles, while *King of Two Sicilies* appears to rely more on the court's ignorance of foreign law. Indeed, *King of Two Sicilies* could be said to have been decided on a version of the threshold questions posed in this case, namely whether there was a real and substantial fear of foreign prosecution. The court there said, in essence, that it lacked the knowledge of Sicilian law sufficient to rule that the claimant faced a risk of prosecution. In *McRae,* however, the law of the United States was clear to the English court. Under those circumstances, the judge ruled that "I cannot distinguish the case in principle from one where a witness is protected from answering any question which has a tendency to expose him to forfeiture for a breach of our own municipal law." *McRae,* L.R., 3 Ch.App. 79 at 87. It is this latter holding that this Court considers the more persuasive.[28]

Justice Goldberg also examined recent American case law focusing on the reach of the privilege in cases involving state and federal jurisdictions. In these cases, the claimant faced prosecution either in a state or a federal court and was granted use immunity but claimed the incriminating testimony could be used in the other jurisdiction. The Court examined the relevant decisions up to *United States v. Murdock,* 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) and found them conflicting and unclear.[29] The Court then examined the *Murdock* case, which held that the fear of state prosecution did not justify a refusal to answer questions put by federal officers and was chiefly relied upon by the party then before the Court, and found that the bases upon which the decision was made were faulty.[30]

The Court next examined *Feldman v. United States,* 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), which held that evidence compelled by a state government under state immunity was available to the federal government, and held it inapplicable. The Court observed that the *Feldman* court had relied on the then valid search and seizure rule which held that evidence compelled by a state grant of immunity could be used by the federal government. As that rule had been overturned in *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the legal foundation of *Feldman* was no longer sound.

---

**28.** In 1968, Parliament changed the state of the law in Great Britain. The new law reads in relevant part:

> The right of a person in any legal proceedings other than criminal proceedings to refuse to answer any question or produce any document or thing if to do so would tend to expose that person to proceedings for an offense or for the recovery of a penalty ... shall apply only as regards criminal offenses under the law of any part of the United Kingdom and penalties provided for by such law.

Civil Evidence Act, 1968 § 14.

**29.** The Court noted that language and holdings in *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), *Jack v. Kansas,* 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234 (1905), and *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906) appeared to contradict those in *United States v. Saline Bank of Virginia,* 1 Pet. 100 (1828) and *Ballmann v. Fagin,* 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906). The Court further observed that *Brown* involved the construc-

tion of a federal immunity statute and that the Court held that the statute prevented prosecutions in either state or federal court. The relevant language in *Jack,* said the Court was simply dictum. Finally, the Court questioned the applicability of the precedent relied on in *Hale* to support its holding.

**30.** Justice Goldberg said that the Court in *Murdock* gave three reasons for holding that the fear of state prosecution did not justify the refusal to answer questions put by federal officers. First, federal investigations may not be prevented by state law. That, said the Court, begged the question. *Murphy,* 378 U.S. at 71, 84 S.Ct. at 1605. The second reason relied on was the English rule of evidence. That said *Murphy* was an incorrect reading of English precedent. *Id.* The third reason supplied by the Court in *Murdock* was that the rule had been established by prior decisions. This, said the *Murphy* Court, was simply an inaccurate reading of American precedent. *Id.* at 72–73, 84 S.Ct. at 1605–06.

The Court concluded its survey by noting that the cases since *Feldman* relied on a distinction between the Fifth and Fourteenth Amendments that was no longer valid after the Court's decision in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Court concluded with the following statement:

> The foregoing makes it clear that there is no continuing legal vitality to, or historical justification for, the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction.

*Murphy,* 378 U.S. at 76, 84 S.Ct. at 1608.

There is nothing in the *Murphy* decision to suggest that it was intended to apply only to the state-federal context.[31] Rather, though not explicitly stated, there are indications that the privilege was meant to apply to any foreign jurisdiction, state or country. Certainly the policy rationales set forth at the beginning of the opinion are not dependent on a domestic prosecution. If the privilege were so limited, it would certainly lose at least some of its status as " 'one of the great landmarks in man's struggle to make himself civilized'." [32] Moreover, to ground the privilege in the tenets of common law adopted from England, the Court relies on English cases applying the privilege to foreign countries. Clearly, the intent of the Supreme Court was to establish a rule that would transcend state boundaries and apply as well to national boundaries.

The district courts that have applied the privilege to a foreign prosecution have essentially relied on the holding and logic of *Murphy.*[33]

In *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972), a witness refused to answer several questions before a federal grand jury in a drug seizure case, citing her Fifth Amendment privilege. The government granted her use immunity and applied to the court for an order to compel her testimony. The witness refused to testify on the ground that she could be prosecuted in Mexico. The court denied the motion to compel, stating that use immunity could not displace the self-incrimination privilege when the witness alleges a reasonable fear of foreign prosecution. *Id.* at 1086. When the government relied on an analogy to extradition cases, the court distinguished them on the ground that in the instant case the American court, not a foreign body, would be the compelling party:

> It is one thing for a federal court to decline to interfere with the treaty obligation of the Executive Branch to surrender a prisoner to a foreign government, once the court has determined that the prerequisites to extradition have been met. It is entirely different for a federal court to use its judicial power to compel a witness, under threat of incarceration for contempt, to provide testimo-

---

**31.** It has been suggested that *Murphy*'s holding could be distinguished on the ground that it was simply an implementation of the Court's earlier ruling in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment was applicable to the states through the Fourteenth Amendment. *See e.g.,* Capra, *The Fifth Amendment and the Risk of Foreign Prosecution,* New York Law Journal, Mar. 8, 1991; Note, 69 Va.L.Rev., *supra* note 20, at 881. This argument, however, ignores the fact that the majority in *Murphy* clearly based its holding on the policy behind the privilege as well as on English and American precedent. Had the Court wished to limit the holding in *Murphy* to the situation presented by *Malloy,* it could have easily—and very cursorily—done so.

**32.** *Murphy,* 378 U.S. at 54, 84 S.Ct. at 1596 (*quoting Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956)).

**33.** *See In re Flanagan,* 533 F.Supp. 957 (E.D.N.Y.), *rev'd on other grounds,* 691 F.2d 116 (2d Cir.1982); *Yves Farms, Inc. v. Rickett,* 659 F.Supp. 932 (M.D.Ga.1987); *United States v. Trucis,* 89 F.R.D. 671 (E.D.Pa.1981); *Mishima v. United States,* 507 F.Supp. 131 (D.C.Alaska 1981); *In re Letters Rogatory from 9th Criminal Div., etc.,* 448 F.Supp. 786 (S.D.Fla.1978); *United States v. Kowalchuk,* Nos. 77–118, 77–119 (E.D.Pa. Oct. 20, 1978), available on LEXIS, Genfed library, Dist file; *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972). *Accord In re Federal Grand Jury Witness,* 597 F.2d 1166 (9th Cir.1979) (Hufstedler, J., concurring, would adopt the reasoning of *Cardassi* if the constitutional issue were presented).

ny that may well lead to a successful foreign prosecution.

*Id.* at 1085. The court concluded by noting that any possible hindrance this extension of the privilege could have on law enforcement was no argument against its proper assertion.

In *Mishima v. United States,* 507 F.Supp. 131 (D.C.Alaska 1981), five Japanese seamen sought to quash subpoenas issued by the United States Coast Guard in its investigation into the grounding of the M/V Ryoyo Maru No. 2 on November 8, 1979. Petitioners claimed their testimony would tend to incriminate them under Japanese law. The court denied the general motion to quash, and instead limited the privilege to those defendants who faced a real threat of foreign prosecution, and only for those questions that would tend to incriminate them under Japanese law. In its reasoning, the court strongly criticized the Tenth Circuit's devaluation of *Murphy* in *In re Parker,* 411 F.2d 1067, 1070 (10th Cir.1969), and reasserted *Murphy's* policy rationale concerning the Fifth Amendment's reflection of America's fundamental values. *Id.* at 134.

In *United States v. Trucis,* 89 F.R.D. 671 (E.D.Pa.1981), the United States brought suit against Arnold Trucis to revoke his Certificate of Naturalization on the ground that he knowingly concealed information about his participation in the Nazi persecution of Jewish civilians during World War Two. The government sought an order to compel Trucis to give answers at a deposition and produce certain pertinent documents.

In response, he asked for a protective order prohibiting scheduled depositions in Latvia, and refused to give answers or supply documents, invoking his Fifth Amendment privilege against self-incrimination. He claimed that the government could give him no assurances that, in the event he lost his citizenship, he would not be sent to a nation seeking his criminal prosecution.

The court held that it could not, consistent with the Fifth Amendment, compel Trucis's testimony, "at least where, as here, the possible foreign prosecution would be for crimes recognized as such in this country." *Id.* at 673. The court continued,

> For the privilege is not simply a limit on the activities of American courts and law-enforcement authorities: it is a freedom conferred upon persons within the protection of American law.

*Id.* Finally, the court cited *Murphy's* reading of English cases as being "supportive of the proposition that the English privilege, from which our own privilege derives, affords protection beyond the realm." *Id.*

As noted earlier, in *In re Flanagan,* 533 F.Supp. 957 (E.D.N.Y.1982), the United States brought contempt proceedings against Martin Flanagan, a dual citizen of the United States and the Republic of Ireland, to compel his immunized grand jury testimony concerning an alleged conspiracy to possess, transport, and smuggle firearms and ammunition from the United States to Great Britain and Ireland in violation of several federal firearm statutes. Flanagan had sought to avoid testifying under the original subpoena, claiming that to do so would make him subject to prosecution in Northern Ireland, the Republic of Ireland, and Great Britain.

In expanding the privilege to foreign proceedings, the court held that as a foreign court cannot guarantee that it will uphold the immunity offered the witness in this country, that immunity is insufficient to supplant the protections guaranteed by the Fifth Amendment.[34]

In the most recent case of this series, *Yves Farms, Inc. v. Rickett,* 659 F.Supp. 932 (M.D.Ga.1987), the plaintiffs filed suit under the Racketeering Influenced and Corrupt Organizations Act (RICO) for common law fraud, breach of contract, breach of fiduciary duty, and negligence.

---

**34.** This holding was later overruled by the Second Circuit on the ground that the witness had not established a real and substantial fear of foreign prosecution. *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116 (2d Cir.1982) (*see* discussion of *Flanagan, supra* ).

Plaintiff Yves Burgand, a French Citizen, alleged that the defendants had defrauded him through a scheme to sell property to French investors at inflated prices. He had formed Yves Farms, Inc. to purchase agricultural land in the United States, and claimed that the defendants made written misrepresentations concerning the production capability of the farm prior to his purchase, resulting in his significant financial loss.

The defendants sought to compel Burgand to answer questions concerning his financial sources for the purchase. They suspected the money used for the investment was removed from France against French currency laws, making Burgand subject to forfeiture and criminal fines. Charges were pending against Burgand in France at the time. The defendants argued that Burgand sought to invest the "hot" money quickly, without due care, negating any reasonable reliance he might have placed in their representations.

The court denied the defendants' motion, holding that the Fifth Amendment protects against fear of a foreign prosecution. The court seemed to base its decision primarily on the fact that the information sought by the defendants' was to be used solely to impeach the plaintiff, and, thus, did not rise to the level of importance of the plaintiff's information which might subject him to foreign prosecution. "The potential implications that the compelled testimony would have for Mr. Burgand are serious, and far outweigh any potential inconvenience to Defendants." *Yves Farms, Inc.*, 659 F.Supp. at 940.

· While all the district courts to address this issue have upheld the privilege, other courts have refrained from applying the privilege in the foreign context.[35] Of the opinions adopting this stance, the Fourth Circuit's is the most thorough in its treatment of the issue. The issue there arose in the context of the flight from the Philippines of the Aranetas, the daughter and son-in-law of Ferdinand Marcos. After their arrival in the United States, the Solicitor General of the Philippines filed criminal charges against them alleging conspiracy and other crimes under Philippine statutes. They were served with grand jury subpoenas and offered immunity, but still refused to testify. They claimed that their right not to incriminate themselves had extraterritorial effect and that a grant of immunity would not prevent the use of their testimony in a criminal trial in the Philippines. After finding that the Aranetas faced an objectively reasonable expectation of prosecution in the Philippines, the court moved on to the constitutional issue.

The court first noted that the Fifth Amendment, by its terms, does not purport to have effect in foreign countries, and that ordinarily, domestic law, statutory or constitutional, is deemed to apply only to the jurisdiction which enacts it. *(Under Seal)*, 794 F.2d at 925. Then, analogizing from the lack of cross-border application of the privilege before it was held applicable to the states, it held that the privilege would not apply in a foreign prosecution:

> From this history, we conclude that the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment from compelling self-incrimination.

794 F.2d at 926.[36] *See also In re Parker*, 411 F.2d at 1070 ("The fifth amendment

---

**35.** *See United States v. (Under Seal)*, 794 F.2d 920 (4th Cir.), *cert. denied*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *In re Parker*, 411 F.2d 1067 (10th Cir.1969). *See also United States v. Joudis*, 800 F.2d 159 (7th Cir.1986) (the existence of a Fifth Amendment right not to testify as to matters incriminating in a foreign court is questionable). One state Supreme Court has followed the rulings of the circuit courts. *Phoenix Assur. Co. v. Runck*, 317 N.W.2d 402 (Sup.Ct.N.D.), *cert. denied*, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).

**36.** The claimants applied for a stay of the contempt order entered as a result of the judgment in *(Under Seal)*. *See Araneta v. United States*, 478 U.S. 1301, 107 S.Ct. 1, 92 L.Ed.2d 751 (1986). Chief Justice Burger, as Circuit Justice, granted the stay after finding that:

> It [was] more likely than not that at least five Justices will agree with the Court of Appeals that the applicants face the kind of risk found lacking in *Zicarelli*, and will therefore reach and decide the question reserved in that case. And although such matters cannot be predict-

was intended to protect against self-incrimination for crimes committed against the United States and the several states but need not and should not be interpreted as applying to acts made criminal by the laws of a foreign nation."); *United States v. Joudis*, 800 F.2d 159, 161 (7th Cir.1986) (the existence of privilege that extends to foreign prosecutions is questionable).

The Fourth Circuit rested its limitation of the privilege on two primary grounds. First, that the Fifth Amendment, by its terms, does not extend to a jurisdiction not enacting it. Though the Fourth Circuit did not support this bald statement and though the Constitution may well be different in this respect from a statute, this Court will, for the sake of argument, accept this premise.[37]

■ However, with due respect to the Fourth Circuit, this Court believes that it misapprehends the focus of the privilege. The point of inquiry here should be directed not to the jurisdiction in which the compelled testimony is to be used, but rather to which governmental entity, under which law, would effect the compulsion. The case before this Court, just as that before the Fourth Circuit, involves an action to be taken by an Article III court in this country under the Constitution of the United States. Specifically, the compelling body is a court of this nation operating under the American Constitution. It is undeniable that the Fifth Amendment applies to this Court. The fact that the information so compelled may be used by a foreign jurisdiction does not exonerate this Court from its constitutional obligations.

Second, the court relied on the fact that prior to *Murphy* the privilege was limited to federal or state courts and did not have application in the other jurisdiction. The *Murphy* majority demonstrated that the case law supporting this principle was not as unblemished as previously assumed. In *United States v. Saline Bank of Virginia*, 1 Pet. 100 (1828), the government, seeking to recover certain bank deposits, brought suit in a federal court. The defendants resisted discovery on the ground that they might impeach themselves under the law of Virginia. Chief Justice Marshall, ruling for the defendants, held:

It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. The rule clearly is, that a party is not bound to make any discovery which would expose him to penalties, and this case falls within it.

*Id.* at 104.

In *Ballmann v. Fagin*, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906), Ballmann had been held in contempt of a federal court for refusing to answer questions before a federal grand jury. He claimed that his answers might expose him to the criminal law of the state in which the grand jury was sitting. *Murphy*, 378 U.S. at 65, 84 S.Ct. at 1602. Justice Holmes, writing for the Court, held that "[according] to *United States v. Saline Bank*, 1 Peters, 100, he was exonerated from disclosures which would have exposed him to the penalties of the state law." *Ballmann*, 200 U.S. at 195, 26 S.Ct. at 213.

Therefore, it would appear that the attempts to distinguish *Murphy* in *(Under*

ed with certainty, I conclude there is a "fair prospect" that a majority of this Court will decide the issue in favor of the applicants. *Id.* 478 U.S. at 1304, 107 S.Ct. at 2. The Court ultimately denied the *(Under Seal)* claimants' petition for a writ of certiorari, with three Justices voting to grant certiorari. *Araneta v. United States*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).

**37.** The Court does observe, however, that the Fourth Circuit's rationale that the language of the Fifth Amendment does not by its terms purport to have effect in foreign countries seems a rather procrustean attempt to "inter-

pret" the language of the Amendment according to its terms. As discussed above, in determining the meaning of constitutional language, it is important to give effect to the plain meaning of the language as it exists and not attempt artificial expansion or limitation. In this case, the point is *not* what the constitutional language does not say; it is what it does say—that "[n]o person ... shall be compelled in *any* criminal case to be a witness against himself." If looking only at the language, it does not seem necessary to search for hidden meanings or the import of purportedly missing terms: "Any" means "any."

*Seal)* and *In re Parker* were not thoroughly grounded in precedent. Not only was *Murphy* correct about the expansion of the privilege in the federal-state context, but this expansion, following the policy implications of the holding in *Murphy*, necessarily flows to trans-national application as well.

The North Dakota Supreme Court also examined this issue in *Phoenix Assur. Co. v. Runck*, 317 N.W.2d 402 (1982), where it held the privilege inapplicable to foreign prosecutions. It emphasized the practical difficulties that could result were witnesses able to plead the privilege on the basis of a fear of foreign prosecution. Noting Justice White's concurrence in *Murphy* detailing the confusion that would result when the privilege became applicable to the states, the court observed:

> The law of other countries or nations would actually be controlling in such a situation, rather than the wishes and laws of the state or federal government. This can become more complicated if we realize, which we must, that not all nations are friendly to the United States, and some are anything but friendly if not outright antagonistic.

*Phoenix*, 317 N.W.2d at 412. *See also (Under Seal)*, 794 F.2d at 926 ("[i]t would be intolerable to require the United States to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country.").

▮ Under the test mandated by the Supreme Court in *Zicarelli*, a court reviewing a Fifth Amendment claim in the foreign jurisdiction context must satisfy itself that there is a real and substantial risk of foreign prosecutions. This is a significant threshold requirement, and, as noted above, many cases have not passed it. Only once a real and substantial threat has been demonstrated does the question of interference with domestic law enforcement efforts arise. While this Court appreciates the potential burdens that expansion of the privilege might place on law enforcement officials, it cannot abrogate a right solely on this ground. In fact, the Bill of Rights as a whole stands for the proposition that the rights of the individual must, in constitutionally defined circumstances, be preeminent, even when those rights may entail hardship to law enforcement personnel. As stated by Professor Levy:

> With good reason the Bill of Rights showed a preoccupation with the subject of criminal justice. The framers understood that without fair and regularized procedures to protect the criminally accused, there could by no liberty. They knew that from time immemorial, the tyrant's first step was to use the criminal law to crush his opposition. Vicious and ad hoc procedures had always been used to victimize nonconformists and minorities of differing religious, racial, or political persuasion. The Fifth Amendment was part and parcel of the procedures that were so crucial, in the minds of the framers, to the survival of the most treasured rights.

Levy, *supra* p. 341, at 431.

For all of these reasons, this Court must respectfully decline to adopt the Fourth Circuit's holding and reasoning in *(Under Seal)*.

## CONCLUSION

▮ The language, history, and policies of the Fifth Amendment privilege support its application to situations in which testimony compelled domestically may be used in a foreign criminal prosecution. The language of the Amendment itself prevents the United States government, including American courts, from acting as a compelling agent in this context. The history and policy behind the privilege bolster this interpretation. The right against self-incrimination is an ancient and fundamental one, stretching back into the beginnings of our jurisprudential traditions. As adopted in English common law, it was a broad and fundamental protection of the individual against the abuses of a government. The right, as interpreted prior to the formation of our Constitution, provided for the extension of this fundamental privilege to foreign proceedings. It was this broad conception of the privilege that was adopted by the Founding Fathers.

Were the Debtor, though a United States citizen, compelled to testify in a Swiss proceeding, the government of the United States would be unwilling or unable to influence the proceeding. But, so long as a claimant, of whatever citizenship, is under the protection of the United States Constitution, the protections and benefits of that document inhere in that individual and may not be abrogated because of the fortuitous location of the criminal prosecution in question. This Court has been invited to serve as a compelling agent in this proceeding against the mandate of the Fifth Amendment privilege. It must decline.

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Trustee's Motion for Order Compelling Debtor to Testify is hereby DENIED.

IT IS FURTHER ORDERED that the Debtor shall answer those questions as to which she does not claim the Fifth Amendment privilege against self-incrimination.